## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MICHAEL PALMER,         )
                               )
           Plaintiff,       )
                               )
vs.                         )     Case No. 4:07CV1283 JCH/AGF
                               )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,   )
                               )
          Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Michael Palmer was not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, or supplemental security income ("SSI") under Title XVI of the Act, id. §§ 1381-1384f. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be reversed and that the case be remanded for further consideration.

Plaintiff, who was born on December 27, 1962, filed for disability benefits on October 19, 2005, at the age of 43, claiming a disability onset date of January 15, 2005, due to panic and anxiety attacks. After his application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge

("ALJ").  Such a hearing was held on September 19, 2006, at which time Plaintiff

amended his alleged onset date to September 22, 2005.  The ALJ found that Plaintiff had

the residual functional capacity ("RFC") to perform his past work as a truck driver, and

that thus, Plaintiff was not disabled.  On May 11, 2007, the Appeals Council of the Social

Security Administration denied Plaintiff's request for  review.  Plaintiff has thus

exhausted all administrative remedies and the ALJ's decision stands as the final agency

action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in

the record as a whole.  Specifically, Plaintiff argues that the ALJ improperly failed to

consider all the demands of Plaintiff's past work in finding that he could perform such

work, erred in failing to accord controlling weight to the opinion of Plaintiff's treating

psychiatrist (Muhammad Baber, M.D.) with regard to Plaintiff's abilities, assessed an

RFC that was not supported by the evidence, and did not properly evaluate the credibility

of Plaintiff's subjective complaints.  The Commissioner argues that the ALJ's decision is

supported by the record, and that if the Court concludes otherwise, the proper remedy is a

remand for further consideration, rather that a remand with an order to award benefits.

## BACKGROUND

### Work History and Application Forms

In his application for benefits, Plaintiff reported working from 1995 to June 2005

for 12 different employers in four different states, as a machine operator, a truck driver

for six different companies, a crew leader for two fence companies, and a portable toilet

serviceman (cleaner).  Id. at 105-07, 111.  Plaintiff reported that at four of his trucking jobs, his duties included keeping log books.  Id. at 112-14.  Plaintiff's earnings records show minimal earning from 1977 through 1982; approximately $11,000 in each of 1982 and 1983; minimal earnings from 1984 through 1988; and annual earning ranging from approximately $10,000 to approximately $20,000 in 1989 through 2000, with low earnings in 1995, 1999, and 2001.  In the four years leading up to Plaintiff's alleged onset of disability, he earned approximately $21,000 in 2002, $28,000 in 2003, $34,000 in 2004, and $15,000 in 2005.  Id. at 96-98.

In a third-party report dated November 8, 2005, Plaintiff's sister Susan Groh (with whom he was living at the time) indicated in check-box format that Plaintiff was unable to concentrate, make plans, or set goals, and that he had nightmares.  He prepared his own meals, mowed the lawn, and did laundry and repairs.  Ms. Groh wrote that Plaintiff went outside everyday, drove a car, went out alone, did grocery shopping twice a month, paid bills and counted change.  He had no interest in socializing, his ability to follow written and spoken instructions was "fair," he did not get along well with authority figures, and he did not handle stress or change well.  Id. at 146-53.

On application forms completed on November 11, 2005, Plaintiff reported that he was currently taking Seroquel, Mirtazapine, and Klonapine for bipolar disorder, and medications for diverticulitis.  Id. at 110.  Plaintiff wrote that he was afraid to go out in public, was unable to hold down a job and interact with people, and had nightmares and sleep problems.  Plaintiff reported that he prepared his own meals (sandwiches, frozen

foods, fast food), but sometimes had no appetite. He mowed the lawn and did laundry and repairs around the house. He could count change, but could not pay bills or handle a bank account. Plaintiff wrote that he had lost interest in everything, did not participate in any social activities, and rarely went out because he did not like to be with people. He could not follow written or spoken instructions well, and he did not get along well with authority figures. He noted that he had been fired because of problems getting along with other people. Plaintiff reported that he did not handle stress or change well and that he would "blow up." He felt that everyone was against him, and that hopelessness and fear were his biggest enemies. Id. at 140-45.

**Medical Record**

From September 22 to October 3, 2005, Plaintiff was hospitalized at a psychiatric hospital, presenting with depressive symptoms, complaints of uncontrollable crying and episodes of euphoria, and suicidal thoughts. His memory, concentration, and cooperation were limited at admission, and he was assigned a Global Assessment of Functioning ("GAF") score of 35.[1] Blood tests revealed the presence of marijuana. Dr. Baber, who treated Plaintiff during his hospitalization, diagnosed, upon discharge, antisocial

---

[1] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41 to 50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

personality disorder, bipolar disorder (most recent episode being depression), marijuana dependence, and a GAF score of 65.  Id. at 315-18.

After discharge, Plaintiff was seen at a behavioral health clinic for follow-up.  An initial assessment dated October 10, 2005, reviewed the history of Plaintiff's illness, noting that he attributed the start of his problems to a head injury sustained at age 20 (presumably in a car wreck mentioned later).  Plaintiff  reported that he was currently unable to function due to his mood swings.  The interviewer noted that Plaintiff was tearful during most of the interview.  Plaintiff reportedly began self-medicating his depression in 2002 by using cocaine, eventually using up to $1,000 worth per day.  He then went through a rehabilitation program, and at the time of the interview, claimed not to have used cocaine in over 90 days.  He admitted that he had used marijuana on a regular basis since he was nine years old, up until his recent hospitalization.  He did not see his marijuana use as causing problems in his life, but he knew he should not use it.  Id. at 298-300.

The assessment noted two hospitalizations in 1997 for depressive symptoms, after which Plaintiff had not pursued follow-up appointments; it was also noted that Plaintiff had not been medically compliant in the past.  Plaintiff was sexually abused as a child, two of his three brothers committed suicide and the other brother died of alcohol abuse, his one sister was diagnosed with bipolar disorder, and his mother was also mentally ill.  The assessment noted that Plaintiff completed 12th grade and went to college for two years before his car wreck.  Plaintiff reported that he had been fired from a job driving a

semi-trailer "for having mood swings."  He also reported that he moved to Missouri about three months ago "on impulse" and to take care of his sister, but that she was taking care of him.  Plaintiff's IQ was assessed as average.  His prognosis was noted to be good if he stayed off drugs, including marijuana.  He was diagnosed with bipolar disorder (most recent episode depressed), cocaine dependence in early full remission, marijuana dependence, antisocial personality disorder by history, and a current GAF of 60.  Id. at 301-11.

Following the initial assessment, Plaintiff saw Dr. Baber for medical management every few weeks from November 2005 to April 2006, with Dr. Baber increasing and adjusting Plaintiff's medications in an attempt to reduce Plaintiff's anxiety, depression, and sleeplessness.  Progress notes dated November 8, 2005, reported that Plaintiff complained of increased depression, crying spells, withdrawal, and insomnia in the past two or three weeks.  Remeron was increased, Plaintiff's other medications were continued, and Seroquel was started.  Id. at 283-85.

On December 16, 2005, Robert Cottone, Ph.D., a non-treating, non-examining state disabilities agency psychologist, completed a Psychiatric Review Technique ("PRT") form and a Mental RFC Assessment form.  Dr. Cottone indicated on the PRT form that Plaintiff had an affective disorder, a personality disorder, and a substance addiction disorder.[2]  Dr. Cottone found that Plaintiff met the "A" criteria of listing 12.04

_____

[2]        These disorders are listed in 20 C.F.R. part 404, Subpart P, Appendix 1
(continued...)

for bipolar syndrome with a history of episodic periods manifested by the full

symptomatic picture of both manic and depressive syndromes. Dr. Cottone also indicated

that Plaintiff met the "A" criteria of listing 12.08 for personality disorders with intense

and unstable interpersonal relationships and impulsive and damaging behavior. Dr.

Cottone indicated that there were behavioral or physical changes associated with

Plaintiff's regular substance abuse that affected the central nervous system, such that the

substance addiction disorder was to be evaluated under the other two listings. Dr.

Cottone's functional limitations assessment ("B" criteria) indicated mild restrictions of

---

[2](...continued)
("Appendix 1") as listings 12.04, 12.08, and 12.09, respectively. An affective disorder
(listing 12.04) is presumptively disabling if "A" criteria and "B" criteria were met, or if "C"
criteria were met. "A" criteria (medical findings) are met if there is a medically-documented
persistence of a depressive, manic, or bipolar syndrome. "B" criteria (functional limitations)
are met if there is a marked functional limitation in at least two of the following four
categories: (1) daily living, (2) social functioning, (3) concentration, persistence, or pace, or
(4) repeated episodes of decompensation, each of extended duration. "C" criteria are met
if the disorder has been of at least two years' duration with either (1) repeated episodes of
decompensation, (2) such marginal adjustment that even a minimal increase in mental
demands or change in the environment would be predicted to cause the individual to
decompensate, or (3) one or more years' inability to function outside a highly supportive
living arrangement, with an indication of continued need for such an arrangement.

A personality disorder (listing 12.08) is presumptively disabling if "A" criteria and
"B" criteria are met, which together required deeply ingrained, maladaptive patterns of
behavior resulting in at least two of the following: (1) marked restriction of activities of daily
living; (2) marked difficulties maintaining social functioning; (3) marked difficulties in
maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation
(three episodes within one year), each of extended duration.

A substance addiction disorder (listing 12.09) is presumptively disabling if one of
eight criteria ("A" through "I") is met, including a 12.04 or 12.08 disorder.

daily living; moderate difficulties maintaining social functioning, and maintaining concentration, persistence or pace; and one or two episodes of decompensation. Dr. Cottone did not find the existence of any "C" criteria. Id. at 168-79.

On the mental RFC assessment, Dr. Cottone indicated that Plaintiff was markedly limited in understanding, remembering, and carrying out detailed instructions; and moderately limited in maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within normal tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, completing a normal workday or workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, accepting instructions and responding to criticism, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, being aware of normal hazards and taking appropriate precautions, and setting realistic goals or making plans independently of others. Id. at 164-65.

Dr. Cottone concluded narratively that Plaintiff had to avoid work involving intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, or close proximity to co-workers or controlled substances. Plaintiff, however, could understand, remember, and carry out simple tasks; make simple, work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to

ordinary changes in work routine or setting. Dr. Cottone also opined that Plaintiff's allegations (on his application form) were credible. Id. at 166.

Plaintiff saw Dr. Baber on December 19, 2005, and January 3, January 23, and February 6, 2006, for medical management and adjustment. Dr. Baber noted that Plaintiff's marijuana dependence was in remission, and generally that Plaintiff had experienced improved sleep and some decreased anxiety, although he still had low concentration and motivation. Id. at 276-82, 199. A Treatment Review dated February 3, 2006, covering the period of November 2005 through January 2006, noted that Plaintiff had helped his sister with updating her house. Id. at 201.

Plaintiff continued to see Dr. Baber on a regular basis through February and March 2006, reporting continued anxiety and problems with anger, improved sleep, continued lack of interest and motivation, and racing thoughts off and on. Dr. Baber adjusted and increased Plaintiff's Seroquel and Klonopin. On April 3, 2006, Plaintiff reported "feeling better as a whole," sleeping well, with decreased racing thoughts and decreased mood swings, although Plaintiff still reported the presence of both. Plaintiff was busy helping a friend with remodeling. He reported that his anxiety was intermittent, that his energy level was "in the middle," and that his motivation was a little better. Id. at 196-98.

In a Mental Medical Source Statement ("MSS") completed on April 3, 2006, Dr.

Baber indicated in check-box format that Plaintiff was moderately limited[3] in the ability

to cope with normal work stress, function independently, behave in an emotionally stable

manner, interact with the general public, accept instructions and respond to criticism,

maintain socially acceptable behavior, make simple work-related decisions, maintain

regular attendance and be punctual, sustain an ordinary routine without special

supervision, and work in coordination with others.  Id. at 271-72.

Dr. Baber identified "marked limitations"[4] in Plaintiff's abilities to relate in social

situations, complete a normal workday or workweek without interruption from symptoms,

maintain attention and concentration for extended periods, perform at a consistent pace

without an unreasonable number and length of rest periods, and respond to changes in a

routine work setting.  "Mild" limitation was noted for the ability to maintain reliability

and understand and remember simple instructions.  Dr. Baber reported "one or two"

episodes of decompensation in the past year.  Id.

In the next portion of the form, Dr. Baber indicated that Plaintiff had a "substantial

loss"[5] in understanding, remembering, and carrying out simple instructions; making

_____

[3]  The form defined a moderate limitation as a "[s]ignificant functional limitation that is more than minimal."

[4]   A marked limitation was defined as a limitation that "seriously interferes with the ability to function independently, appropriately, and effectively," and that  was "incompatible with the ability to perform" the rated function in full-time work.

[5]  The form explained that an individual had a substantial loss of ability to perform
(continued...)

simple work-related judgments; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. Dr. Baber diagnosed Plaintiff with bipolar disorder (most recent episode depressed), anxiety disorder (not otherwise specified), marijuana dependence (in early sustained remission), and GAF scores over the previous year ranging from 35 to 70, with 70 being the most recent. Id. at 273-74.

On May 1, 2006, Dr. Baber noted that Plaintiff was doing better, with no mood swings, "very minimal racing thoughts," improved memory and concentration, a fair to moderate energy level, fair insight and judgment, and the ability to handle emotional stress well. Id. at 195. A Treatment Plan Review completed on May 2, 2006, covering the period of February through April 2006, noted that Plaintiff reportedly continued to remain free from drug use, and that he had started helping a friend with rehabbing trailer park homes, at which he worked three to four hours per day. He also helped his sister maintain her home by mowing the lawn and doing repairs. Id. at 200.

On June 1, 2006, Plaintiff told Dr. Baber that June is a difficult month for him because he had sustained many losses in that month. Dr. Baber noted that Plaintiff was sleeping well, and that compared to the previous year, was "doing very well," with no significant mood swings. Id. at 194. In progress notes dated July 3, 2006, Dr. Baber

---

[5](...continued)
the basic mental activity in question "when he or she cannot perform the particular activity in regular competitive employment."

stated that Plaintiff was "at his baseline," had managed to get through June without much problem, and had some small social activities. Id. at 193. Plaintiff sought medical treatment on July 6, 2006, for shortness of breath and vomiting, symptoms which he reported began two days prior, after he tore down an old home. He was diagnosed with acute bronchitis and acute gastroenteritis, for which he was prescribed medication. Id. at 252-62. In mid July 2006, Plaintiff was diagnosed with diverticulitis. Id. at 232-35.

On July 29, 2006, Plaintiff was taken to the emergency room by ambulance, due to suicidal ideation. Plaintiff reported that he had been non-compliant with his medications. After talking to his sister (with whom he had been fighting) on the phone in the presence of the mental health worker at the hospital, Plaintiff indicated that he was no longer suicidal and he was discharged. Id. at 204-09. Two days later, on July 31, 2006, Plaintiff went to a health center due to abdominal pain. Id. at 185. On August 3, 2006, Plaintiff was seen by Dr. Baber for follow-up. Plaintiff was anxious about his recent medical problems. His psychiatric medications were continued. Id. at 192. The most recent medical report in the record is from August 14, 2006, when Plaintiff was again seen for abdominal pain. Plaintiff was prescribed medication and referred to a gastroenterologist for diverticulitis, and was prescribed medication for bronchitis, with follow-up in two weeks. Id. at 183-183A.

## Evidentiary Hearing of March 15, 2006

Plaintiff testified that he lived with his sister, who was receiving Social Security disability benefits, and that he helped her "a little" around the house. The ALJ noted that

according to the October 10, 2005 assessment, Plaintiff had two years of college, to which Plaintiff responded that he only had two college credits for a course taken at his workplace, and that the notation in the assessment must have been due to a misunderstanding. Plaintiff testified that he also had vocational training for truck driving. He had no periods of self-employment. Plaintiff testified briefly about some of the jobs he had had. Id. at 25-28.

When asked about his prior drug use and selling, he testified that he stopped using cocaine in "January 2006 or 2005." The ALJ pointed out that clinical notes showed the use of marijuana in April 2006. Plaintiff denied marijuana use at that time and testified that the clinic had asked him if he was smoking, and that he had said no and that he had "hit a joint once. That was all. . . ." Plaintiff testified that he had been in detox and rehab, and that he had not "touched anything" since moving to Missouri (in the summer of 2005). Id. at 29-30.

Counsel for Plaintiff confirmed that Plaintiff was not alleging any physical impairments. Plaintiff testified that he suffered from bipolar disorder, depression, and anxiety disorder for which he was currently taking his medication as prescribed, but that he was not receiving any therapy or counseling. He testified that his medications made him "a little tired." When asked about his daily activities, Plaintiff testified that he mainly sat and watched TV, helped his sister pick out something for supper, and did yard work when he was "motivated enough to go out and do it." Plaintiff did not attend church, shopped late at night to avoid crowds, cooked a little, and took care of his own

finances.  When asked if he had any hobbies, Plaintiff responded that he liked fishing and stock car racing.  Id. at 29-32.

Upon examination by his attorney, Plaintiff clarified that he had spent three days helping his ex-brother-in-law tear down a house in September 2005, for which he was not paid, and that he had not helped anyone else with any kind of physical work since then. Plaintiff testified that Dr. Baber had increased his Seroquel and Klonopin, which seemed to make things a little better, but that he was still experiencing restlessness and an inability to sleep even when he took sleeping pills.  The ALJ asked why Plaintiff continued to take medication that did not work.  Plaintiff responded that he did so because when he told his doctor that they were not working, his doctor told him to keep taking them while his (Plaintiff's) response to increased doses of Seroquel and Klonopin was being assessed.  Plaintiff testified that he would sometimes not sleep for two or three days, three or four times per month, due to racing thoughts.  Id. at 32-36.

Plaintiff testified that he had racing thoughts "everyday, all day."  He testified that the last change in his medications (about ten days prior to the hearing) "has helped a lot," but that he still had racing thoughts every day, all day, and problems concentrating.  He believed that he had short-term memory loss because he could not remember things from three to four days prior, but could remember things from years ago.  He also stated that he did not want to be around people and had trouble with everyday things like going to a full grocery store.  He would need to "back out" of places where the presence of five or six people made him feel "that way."  Id. at 34-36.

14

Plaintiff stated that he was currently sleeping better, but his sleeping issues were not completely resolved, and he was still having problems with anxiety, feeling that he was "shaking inside . . . pretty much all the time." He would rub something like a worry stone to try to calm himself. He testified that racing thoughts and worries kept him from sleeping, adding that worrying about the hearing that day had kept him from sleeping well for the past two weeks. Id. at 37-38.

Plaintiff testified that he stopped using crack cocaine over a year prior to the hearing. The ALJ asked Plaintiff about Dr. Baber's notes from February, April, and May 2006 that Plaintiff reported that he was sleeping well and feeling better with minimal racing thoughts. The ALJ stated that Plaintiff's testimony was inconsistent with what he had been telling his doctor. Plaintiff responded, "At that time, yes, that's how it was, ma'am. Like I say, he changed my medicine ten days ago . . . increased everything." The ALJ pointed out that the notes she was citing were from February, April, and May 2006. There was no further response from Plaintiff. At the hearing's close, Plaintiff's attorney pointed out that the records from Plaintiff's psychiatric hospitalization in fall 2005 did not show that Plaintiff was positive for cocaine, but only for marijuana, and that the record showed that he had been in remission from marijuana abuse since then. Id. at 38-39.

**ALJ's Decision of October 24, 2006**

The ALJ found that Plaintiff had severe impairments of bipolar disorder, marijuana dependence, and antisocial personality disorder. The ALJ held, however, that because

Plaintiff had only mild impairments of daily living, moderate limitation in social functioning, moderate limitation in maintaining concentration, persistence or pace, and one episode of decompensation, Plaintiff did not have an impairment or combination of impairments that met or medically equaled a presumed-disabling affective disorder, personality disorder, or substance addiction disorder listed in Appendix 1.  Id. at 16-17.

The ALJ concluded that Plaintiff had the RFC to lift and carry up to 25 pounds frequently and 50 pounds occasionally, and to stand and walk for six hours of an eight hour work day; and that Plaintiff should avoid work involving intense or extensive interpersonal interactions, handling complaints of dissatisfied customers, and working in close proximity to co-workers and controlled substances.  The ALJ noted that Plaintiff had a long history of marijuana use, but concluded, that it had never interfered with his ability to seek and hold employment or that he was so addicted that it permeated every aspect of his life.  Id. at 17-18.  In summarizing the medical record, the ALJ pointed to the October 10, 2005 assessment that Plaintiff had not been medically compliant in the past and that his prognosis was good if he stopped using illicit drugs.  The ALJ noted that Plaintiff's GAF was 70 on October 17, 2005, and on May 1, 2006.  Id. at 18.

After summarizing Dr. Baber's April 3, 2006 MSS, the ALJ stated that the indication that Plaintiff had a "substantial loss of ability" to understand, remember, and carry out simple instructions, was not consistent with the other portion of the statement finding that Plaintiff had mild limitations in these areas.  The ALJ believed that more weight should be given to Dr. Baber's treatment records rather than the check-box MSS.

The ALJ referenced the July 29, 2006 report of Plaintiff's noncompliance with his medications, and determined that this reflected "disfavorably on his allegations." The ALJ stated that "the medical records do not document that any treating physician has ever found or imposed any long term, significant and adverse mental or physical limitations upon the claimant's functional capacity." The ALJ commented that Plaintiff testified that he cared for his disabled sister, and in addition, that Plaintiff tore down a house, worked at rehabbing trailers, did yard work, shopping, cooking, and personal finances, and was able to fish. In sum, the ALJ found that Plaintiff's RFC did not preclude his past work as a truck driver, and that thus, Plaintiff was not disabled. Id. at 19-20.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id.; Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have supported

an opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id. § 423(d)(2)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  Barnhart v. Walton,  535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's

impairment meets or is equal to one of the impairments listed in Appendix I. If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc), abrogated on other grounds, 524 U.S. 266 (1998).

If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category listed in the Commissioner's regulations, due to nonexertional impairments such as pain, the Commissioner cannot carry this burden by relying

exclusively on the Commissioner's Medical-Vocational Guidelines, but must consider testimony of a vocational expert as to whether there are jobs available in the national economy that an individual with the claimant's RFC and vocational factors could perform.  <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1137 (8th Cir. 1998).

## <u>ALJ's Determination that Plaintiff Could Perform his Past Work</u>

Plaintiff maintains that in finding that Plaintiff could perform his past work as a truck driver, the ALJ did not make the required comparison between the demands of that work and Plaintiff's mental abilities.  Plaintiff relies on the fact that most of his past jobs as a truck driver required the "skilled" work of keeping logs and records.  The Court finds this argument unpersuasive.  It is true that in determining whether a claimant can perform his past relevant work, an ALJ must compare the limiting effects of the claimant's impairments with the demands of such work.  <u>Zeiler v. Barnhart</u>, 384 F.3d 932, 936 (8th Cir. 2004) (citing <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1239 (8th Cir. 1991) (where there is no evidence of the demands of a plaintiff's past relevant work, a conclusory statement that the plaintiff can perform past work, does not constitute substantial evidence supporting that statement)).  An ALJ may rely on a claimant's own description of his past duties in making these findings, however, and the record with regard to a plaintiff's past work need not be "developed in full detail," as long as there is evidence that the past work involved activities that the plaintiff could perform.  <u>Battles v. Sullivan</u>, 902 F.2d 657, 659 (8th Cir. 1990).  Here, as the Commissioner notes, two of Plaintiff's past trucking jobs, as Plaintiff described them, did not require any "skilled" paperwork.  In

any event, there is nothing in the record to suggest that Plaintiff's mental abilities were not sufficient to keep the logs required of a truck driver. The question remains, however, whether Plaintiff had the RFC to maintain full-time employment as a truck driver "day in and day out."

## Weight Accorded to Treating Psychiatrist's Opinion

Plaintiff next contends that the ALJ erred in failing to give Dr. Baber's opinion of Plaintiff's functional abilities, as expressed in the MSS of April 3, 2006, controlling weight in determining Plaintiff's RFC. Plaintiff points out that Dr. Baber was his treating psychiatrist for five or six months before rendering this opinion. Plaintiff argues that there is no basis for disregarding Dr. Baber's opinion in favor of the earlier December 16, 2005 opinion of Dr. Cottone, a psychologist (of unknown practice level) who had never met Plaintiff and who did not have the benefit of Dr. Baber's subsequent progress notes.

The weight to be given a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2).

An ALJ, however, may "'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)); House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (explaining that while a treating physician's opinion "is entitled to special weight, it does not automatically control, particularly if the treating physician's evidence is itself inconsistent") (citation omitted).

Here, the Court believes that the ALJ was entitled to give less than controlling little weight to Dr. Baber's April 3, 2006 MSS regarding Plaintiff's marked functional limitations, in light of the current (most-recent) GAF score of 70 noted by Dr. Baber in the same MSS. Cf. Lehnartz v. Barnhart, 142 Fed. Appx. 939, 941 (8th Cir. 2005) (treating psychiatrist's opinion was internally inconsistent, and thus deserving of less weight, where his "fair" rating on work-related activities did not support his conclusion that competitive employment was precluded) (citing Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005) ("Physician opinions that are internally inconsistent . . . are entitled to less deference than they would receive in the absence of inconsistencies.")).

This does not mean, though, that Dr. Baber's check-box indications of Plaintiff's abilities are deserving of no weight. While Dr. Baber's treatment records note improvement in Plaintiff's anxiety and depressive symptoms, these records also note Plaintiff's continuing problems in these areas and continuing adjustment to his

22

medications for these problems.   See Duncan v. Barnhart, 368 F.3d 820, 824 (8th Cir.

2004) (holding that although treating psychotherapist's finding a current GAF of 65 might

not have been consistent with remainder of her opinion indicating more restrictive

limitations, ALJ could not simply disregard entirety of psychotherapist's opinion).

Ultimately, the question remains whether substantial evidence supported the ALJ's RFC

determination, as discussed below.

**ALJ's RFC Determination**

Plaintiff argues that at the very least, the ALJ's RFC determination should have

included the full extent of the functional limitations found by Dr. Cottone.  As noted

above, the Eighth Circuit has defined RFC as the ability to do the requisite work-related

acts "day in and day out, in the sometimes competitive and stressful conditions in which

real people work in the real world."  McCoy, 683 F.2d at 1147; see also Duncan, 368

F.3d at 824 (applying this definition of RFC in the context of a plaintiff who suffered

from mental impairments).  The ALJ's determination of an individual's RFC should be

"based on all the evidence in the record, including 'the medical records, observations of

treating physicians and others, and an individual's own description of his limitations.'"

Krogmeier, 294 F.3d at 1024 (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.

2000)).

The ALJ bears the primary responsibility for determining a claimant's RFC.  Id.

Although an RFC is based on all relevant evidence, it "remains a medical question" and

"'some medical evidence must support the determination of the claimant's [RFC].'"  Id. at

1023 (quoting <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001)).  The ALJ is therefore required to consider at least some supporting evidence from a medical professional.  <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).

As noted above, Dr. Cottone found that Plaintiff was moderately limited in many core work-related functions, such as maintaining regular attendance, sustaining an ordinary routine without special supervision, completing a normal workday or workweek without interruptions from psychologically based symptoms, and accepting instructions and responding to criticism.  None of these limitations were factored into the ALJ's RFC determination, nor did the ALJ explain why she did not include them.  In addition, Dr. Cottone believed that Plaintiff's allegations in his application form were credible.

It is not clear from the record why Plaintiff left his previous jobs as a truck driver.  There are references to his having been fired from a job due to his inability to get along with people.  His sporadic work history does not support a finding that he has the emotional or mental capacity to work "day in day out" as a truck driver.

It is true that noncompliance with medication is mentioned in the record.  But both Drs. Babel and Cottone assessed Plaintiff based upon his functioning when he was taking his medications.  In sum, the Court does not believe that substantial evidence in the record as a whole supports a finding that Plaintiff had the emotional or mental capacity to work "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  <u>See</u> <u>Duncan</u>, 368 F.3d at 824 (citing <u>Gavin v.</u>

Heckler, 811 F.2d 1195 (8th Cir. 1987) (granting disability benefits to a claimant with a history of mental disorders and alcohol and drug related problems)).

Ordinarily, when a reviewing court concludes that a denial of disability benefits was improper, the court, out of "abundant deference to the ALJ," should remand the case for further administrative proceedings; remand with instruction to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000). The Court does not believe that here there is overwhelming evidence that would warrant an order that benefits be awarded. Rather the Court believes the ALJ should be granted a chance to more fully consider Plaintiff's RFC, and possibly further develop the record and/or obtain the testimony of a vocational expert with regard to Plaintiff's ability to work.

## CONCLUSION

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** for further consideration.

The parties are advised that they have ten days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_Audrey G. Fleissig_
_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 3rd day of December, 2008